In re Richard Scott **DEGRAFFENREID** and Marion Francis Degraffenreid, Debtors.

**JARBOE SALES COMPANY, Plaintiff,**

v.

Richard Scott **DEGRAFFENREID** and Marion Francis Degraffenreid, Defendants.

**Bankruptcy No. 89–01756–C.
Adv. No. 89–0365–C.**

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 26, 1991.

John B. Jarboe, Tulsa, Okl., for plaintiff.

R. Steven Horn, Tulsa, Okl., for defendant.

Katherine Vance, Tulsa, Okl., Asst. U.S. Trustee.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Chief Judge.

The Plaintiff, Jarboe Sales Company, requests the Court find nondischargeable, under 11 U.S.C. § 523(a)(2)(A), the obligation Debtors owe Plaintiff for inventory. After considering the evidence, the arguments and authorities presented, the Court finds as follows.

### FINDINGS OF FACT

The Debtors were doing business as "WineMart" a retail liquor store, which was partially stocked with liquor from the Plaintiff, a liquor wholesaler. Liquor sales under Oklahoma law are strictly regulated. Although individual consumers may purchase liquor on a credit sale, wholesalers are not allowed to accept credit for the supplies furnished the retailers. Wholesale prices are fixed. The retailers must pay cash by way of a check or hard money upon delivery. The liquor industry is so strictly regulated wholesalers can do very little to distinguish themselves in the market place and thereby ease past the competition. Retailers have little or no incentive to deal with any one wholesaler in particular. See 37 O.S. § 501 et seq.

In the Spring of 1988, Debtors' business had been growing steadily. One of the Plaintiff's salespersons, approached Debtor, Scott Degraffenreid, concerning how the Plaintiff could obtain more of the Debtor's business. Discussions between the parties, concerning the general operation of Debtor's business, brought to light Debtor's cash flow problems because of the delay in payment of credit card sales to the store's bank account.

Through use of careful, delicate language, ever mindful of the strict Oklahoma law, the parties reached a mutual understanding. The Debtor would be able to purchase whatever supplies he needed and present a check in payment. However, if the check was returned for insufficient funds because credit card payments were slow to make it into the store's bank account, the Debtor would be allowed to make arrangements to cover the bad check. The tricky part to the agreement was being careful not to give the appearance of a credit arrangement. In effect, a credit arrangement is exactly what the parties wanted and obtained, circumventing the Oklahoma laws.

Between the months of May 1988 and December 1988, the Defendants presented the Plaintiff with approximately four hundred checks, forty-five of which were returned for insufficient funds. The Debtors made good most of those checks, including those presented to cover bad checks, but which were also returned for insufficient funds.[1]

No insufficient funds checks were presented in October. The Debtor bounced twelve checks in the month of September and in an effort to avoid the appearance of giving a line of credit, the Plaintiff told the Debtors no more checks could be bounced. Service charges would also have to be paid for some of the bounced checks. A payment schedule was agreed upon to "make good" the September checks.

On December 23, 1988, the Debtors were told they would have to pay cash for their shipments, effective immediately. The Debtors informed the Plaintiff a cash payment might result in the outstanding checks being returned for insufficient funds. Being caught between the increase in consumer demand during the holiday season and Plaintiff's cash demands, the Debtors paid the cash. They believed they could ill afford to be understocked during the holiday season and hoped the credit card sales would be credited to the store's bank account in time to clear the outstanding checks. They intended to cover any checks that might bounce as a result.

Six checks bounced in December and one September check remained outstanding by the end of 1988. These seven checks are

1. According to the trial exhibits, insufficient fund checks included: May 1988—four checks; June 1988—five checks; July 1988—six checks; August 1988—five checks; September 1988— twelve checks; October 1988—0 checks, November 1988—four checks and December 1988— nine checks.

the subject matter of the pending litigation. Negotiations between the parties in January of 1989 did not result in any agreement concerning the seven bounced checks. The Debtors were offered an opportunity to execute a promissory note and give a security interest in all the store's personal property, equipment, fixtures, furnishings and inventory, but before Debtors' counsel could approve the documents, the offer was withdrawn. Subsequently, Plaintiff turned over the seven bounced checks to the District Attorney of Tulsa County for collection through that office. Debtors filed their Chapter 7 bankruptcy Petition June 20, 1989.

## CONCLUSIONS OF LAW

Under 11 U.S.C. § 523(a):

a discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services ... to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or insiders financial condition; ..."

■ For nondischargeability, the debtor must make material representations, which he knows are false, with the intent to deceive the creditor. The creditor must reasonably rely on Debtor's representations to its detriment. See *In re Mullet*, 817 F.2d 677 (10th Cir.1987); *In re Stefanoff*, 106 B.R. 251 (Bankr.N.D.Okla.1989); *In re Williams*, 91–157530 Adv. No. 86–0622–C (Bankr.N.D.Okla.1988); *Matter of Garman*, 643 F.2d 1252, 1259–60 (7th Cir.1980); *In re Feldman*, 111 B.R. 481 (Bankr. E.D.Pa.1990); *In re Kurdoghlian*, 30 B.R. 500 (9th Cir. BAP 1983).

■ The burden of proof is on the Plaintiff to show by a preponderance of the evidence the elements necessary for a successful action under 11 U.S.C. § 523(a)(2)(A). *Grogan v. Garner*, 498 U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In *Williams v. U.S.*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the Supreme Court held a check is not a factual representation which can be characterized as true or false. The petitioner had deposited a number of bad checks in federally secured banks. The government argued his conduct was in violation of 18 U.S.C. § 1014 making it a crime to knowingly make a false statement to a federally insured bank for the purpose of influencing its action on an advance, commitment or loan. But, the Supreme Court found the petitioner did not make a false statement when he presented the checks for payment, which later turned out to be bad. Checks do not make a representation, but direct a financial institution to credit or debit an account. *Williams v. U.S.*, 458 U.S. at 284–285, 102 S.Ct. at 3091–92, 73 L.Ed.2d at 773. Following *Williams*, this Court finds the Debtors did not make false representations merely by presenting checks for payment which later bounced.

■ However, the Debtors did make false representations to the Plaintiff, if it can be shown that they gave the checks with the intent of not paying the Plaintiff, knowing they would bounce. A debtor has been found liable where he presented a check or credit card with the intention of not paying. *Matter of Carpenter*, 53 B.R. 724 (Bankr.N.D.Ga.1985); *In re Feldman*, 111 B.R. 481 (Bankr.E.D.Pa.1990); *In re Kurdoghlian*, 30 B.R. 500 (9th Cir. BAP 1983).

■ The Court finds the Debtors did not present the checks with the intention of stiffing the Plaintiff for the supplies. Per the de facto credit agreement with the Plaintiff, the Debtors would make good any check that did not clear. The parties made the agreement to help ease Debtors' cash flow problems in exchange for an increase in supplies purchased from Plaintiff. All but seven of forty-five checks were made good. The Court infers an intent to pay.

The *Feldman* case, supra. and *Kurdoghlian* case, supra. both involved debts resulting from insufficient funds checks which were excepted from discharge. These cases can be distinguished because the debtors therein did not intend to pay their creditors. Feldman gave his creditors a check just to put off their collection pressures with knowledge the check would not clear. Kurdoghlian simply disregarded the

state of his bank account and wrote the check anyway. Here the Debtors intended to pay. The practice of making good bounced checks created a credit arrangement and clearly shows an intent to pay for all inventory.

In addition, the history between the parties since May of 1988 shows the Plaintiff could not have reasonably relied upon a representation that all checks from Debtors were good checks. Plaintiff had to have known any given check might bounce; approximately forty-five bounced during a seven month period. The Debtors continually bounced checks and "picked them up" later. This was standard operating procedure.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the debt to the Plaintiff is discharged. In summary, the Debtors did not give the Plaintiff any check with the knowledge it would definitely not clear the store's account and with the intent of not paying. In addition, the Plaintiff did not reasonably rely upon any assertion or representation by Debtors that all checks at the time of payment were good. A separate order, consistent with this Memorandum Opinion, will be entered.